**Federal Defenders**
OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and
Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

January 19, 2022

**VIA EMAIL & ECF**

Hon. Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**RE**: **United States v. Anthony Riccio, No. 20-cr-522 (NGG)**

Dear Judge Garaufis:

     I write on behalf of defendant Anthony Riccio in anticipation of sentencing, which is scheduled for January 28, 2022, at 11:00 a.m. Mr. Riccio waived indictment and pleaded guilty to one count of willful underpayment of Federal Insurance Contribution Act ("FICA") taxes, in violation of 26 U.S.C. § 7202. At his plea hearing, he admitted not paying FICA taxes for the employees of his former contracting business, AD Custom Interiors, Inc., in the fourth quarter of 2015. That failure to pay, he acknowledges, also covers the years of 2011-2015, a time in Mr. Riccio's life when he faced substantial personal and financial difficulties.

     This underpayment in taxes marks Mr. Riccio's only experience with the criminal justice system, and is an aberration from an otherwise law-abiding life. Further, the prosecution of this case has already been a significant punishment for his crime: Mr. Riccio lost his business and has had trouble finding and maintaining employment because of this charge. Yet he has not lost hope, but has persisted in looking for work, supporting his family and friends, and, to the best of his ability, being a productive member of society. Given the consequences he has already suffered and the aberrational nature of this conduct, a non-incarceration sentence, which would be in line with the punishment imposed on similarly situated defendants in this district, would be adequate punishment for Mr. Riccio's crime.

     We therefore respectfully request that the Court impose a non-guidelines sentence of probation, with the condition that he pay the restitution he owes for his unpaid taxes. That punishment is appropriate under 18 U.S.C. § 3553(a), which provides that the Court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. *See United States v. Ministro-Tapia*, 470 F.3d 137, 141-42 (2d Cir. 2006) (discussing requirement that district court apply parsimony clause at sentencing). Specifically, that sentence will satisfy:

[T]he need for the sentence imposed:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

18 U.S.C. § 3553(a)(2). It will also avoid unwarranted sentencing disparities among defendants with similar records who were convicted of engaging in similar conduct. *Id.* § 3553(a)(6).

## I. Mr. Riccio Failed To Pay Taxes During a Period of Financial Distress.

Mr. Riccio was a contractor who mostly did residential building and renovation projects in New York City, and operated under AD Custom Interiors, an S-corporation he solely owned. He was responsible for submitting bids for work and ensuring that his jobs were completed per the terms of the contract. He was required to obtain supplies, recruit and staff the necessary employees, subcontract tasks to licensed professionals where appropriate, and perform and supervise the demolition and construction consistent with the terms of the agreement and governing building codes. It was his responsibility, too, to ensure that all of this work was completed within the time and budget of his bid. As a contractor, Mr. Riccio's livelihood was based on profits he earned on his job—that is, the difference between what his clients paid him and what he spent on labor, supplies, and other business costs to complete the contracted work.

By all accounts, Mr. Riccio was a talented and professional contractor. His clients describe him as having performed "extensive and trustworthy work" on their homes and buildings. Ex. B at 1-2 (Lucian Gandolfo letter); Ex. K at 1 (Susan Stevens letter). Margaret Salamone, an architect, retained him to provide general contracting services for multiple projects because he was "reliable," "honest" and "a skilled craftsman willing to share his expertise." Ex. J. Mr. Riccio's brother, Salvatore, adds that he took great pride in his work, would show off his projects to family, and made a point of listening to his clients, completing all of his jobs as the contract required, and ensuring that his clients were satisfied with the finished project. Ex. H.

Mr. Riccio, however, admittedly kept very poor business records. And, in 2011 through 2015, he cut corners when it came to compensating his employees, many of whom he paid in cash without reporting those payments to his accountant and the IRS. Worse, when Mr. Riccio paid his workers, he did not withhold the employment and insurance taxes due the government, contrary to what he knew he was supposed to do.

But this failure to pay the taxes he owed during this time cannot be attributed to avariciousness or an attempt to enrich himself at the government's expense. Those who know

Riccio best all attest that he "is not a get rich quick guy," Ex. K at 1, and were shocked to learn the financial stress he was under, which he had kept hidden, out of pride and embarrassment Ex. A at 1 (Richard Dandrea letter); Ex. B at 2. Mr. Riccio failed to pay his taxes because his contracting business was not earning enough money to cover gambling debts accrued by his wife and, later, to pay for his costly divorce from her. PSR ¶ 33; Ex. C at 2 (Grace Pirozzi letter). Mr. Riccio's ex-wife, Adele, was responsible for managing the household's money, but she had alcohol and gambling addictions and lost thousands of dollars a month playing casino games. Consequently, she and Mr. Riccio struggled to make basic payments, like electric and gas bills, even though AD Custom Interiors was yielding enough income to cover them. In 2013, when they separated, Mr. Riccio still faced financial problems: he was responsible for his and Adele's home expenses, which included college tuitions for his daughters, while his ex-wife continued to mismanage the money that he set aside for her. This put Mr. Riccio in a terrible bind making ends meet. Regretfully, he did so by not reporting and paying the taxes he owed—which he knows he should not have done.

Mr. Riccio accepts responsibility for these errors and is deeply remorseful for having chosen to keep himself and his family financially afloat by not paying his taxes. We ask that the Court take into consideration the mitigating personal and financial circumstances that were present at this moment in his life. They do not excuse his choices and behavior, but, we submit, help explain why Mr. Riccio violated the law, and clarify that he did not pay his taxes to enrich himself at the government's expense, but to eke out a living for himself and his family during a period of crisis.

## II.     Mr. Riccio Has Otherwise Led an Upstanding Life.

Mr. Riccio's offense conduct is aberrational. His failure to pay employment taxes marks a deviation from an otherwise upstanding life that he has devoted to his family and community. Indeed, Mr. Riccio's friends and family know him to be an honest person of integrity who puts others' interests before his own. "Thoughtful, caring and loving to his family and friends," is how they describe him. Ex. C at 2. He "always tak[es] the time out of his own life to listen to you, to help you, whether he knows you twenty years, or met more recently. Anthony will offer his assistance before anyone asks him for it. Anthony wouldn't do anything for someone with an expectation" of something in return. *Id.* Mr. Riccio's care and generosity can be seen in the letters that are attached to this sentencing memorandum. They portray the person Mr. Riccio actually is, a man whose deeds and merits are greater than the tax crime he committed.

Mr. Riccio puts family first and has lived his life to provide a better world to his children and relatives than he received. He is, in the words of his cousins, "that one relative we all have had in our respective family who is always involved and concerned about members of his immediate and extended family," *id.*, who is always present for his relatives to "feed them, entertain them, support them, and love them" in times of need, Ex. D (Joseph Pirozzi letter). "Family is very important to Mr. Riccio," his therapist, Susan Stevens, writes, because "[h]e grew up in a dysfunctional home that provided a state of fear and hopelessness with no safety net." Ex. K at 1. Indeed, Mr. Riccio's father was physically and emotionally abusive, PSR ¶ ,35,

and, as a child, he witnesses his father "constantly hit and attack" his mother. Ex. E at 1 (Alexa Riccio letter). "As a result he is very intent on being a good role model for his daughters, determined to be a success so that he can make things better and provide the safety net form them that he never knew." Ex. K at 1.

His two daughters, Amanda and Alexa, speak to their father's care and generosity. "Most people will say that they have the best dad in the world, but when I say it I mean it with all my heart," Alexa writes. "My dad is not only the best father anyone can have, he is also my best friend. . . . He has done everything for my sister and I our whole lives, and even though it wasn't always easy he would make sure we were always the happiest we could be." Ex. E at 1. Amanda echoes her sister. "I have never seen a father love his children more than the way he loved me and my sister." He "nurtured us at every step of the way by giving us an excellent education, excellent advice, and a happy place to grow up into the women that we are today." Ex. F.

Sensitive to the impact of his father's emotional neglect and abuse upon him, Mr. Riccio has made it a point to make sure his daughters know that he loves and appreciates them. Every night, Alexa writes, he would tell his daughters that he loved them and say a prayer over them. Ex. E at 1. He encouraged both of his daughters to attend college and inspired them with his work ethic. *Id.* at 2. And he stayed married to their mother, despite their rocky relationship and financial troubles, until his children were in their late teens, when they were old enough to understand and assure him that they would not be hurt by their parents' separation. *Id.* Ms. Stevens writes that, in their therapy sessions, "Mr. Riccio often spoke of his daughters, and how important his construction business was to him as a conduit to earn the money to make things better for them in their lives. He was not college educated himself and wanted very much to see his daughters have opportunities that could make their lives better than it had been for him." Ex. K at 1. Ultimately, in the opinion of his cousin, Grace Pirozzi, "If it weren't for Anthony, his daughters would not have gone to college and enjoy[ed] their present successful careers." Ex. C at 2.

Mr. Riccio also instilled in in his children "that family is the most important thing in the world." Ex. F. He made sure that he and his daughters had weekly extended family dinners, so they would remain close to their grandmother, aunts, uncles, and cousins. Ex. I at 2 (Valerie Riccio letter). And he demonstrated what being family means, by supporting his mother, brothers, and other family members. Ex. A at 1.

His assistance to his brother, Frank Riccio, is perhaps the clearest example of Mr. Riccio's care for his loved ones. In 2017, Frank fell and suffered a traumatic brain injury in Florida, where he was living. PSR ¶ . The injury "left him unable to walk, talk, or take care of himself," Ex. G at 1 (Grace Riccio letter), and he was in a medically induced coma for a period of time, Ex. E at 2. As Frank's wife, Valerie, writes:

> Anthony, being the selfless and loving brother/uncles he is, dropped everything he was dealing with in New York and traveled down to Florida to stay with us for an extended period of about two months. During that time he made numerous trips to

> the hospital with me to visit my husband as well as aiding the family in any day to day chores/errands I was unable to complete. . . . He also generously offered to help our family financially while simultaneously enduring an extremely expensive and stressful divorce himself.

Ex. I at 2. Frank's daughter, Grace, adds: "to put it bluntly, it takes a special kind of person to bathe, spoon-feed, and change the diaper of a 50-year-old man. And Anthony did just that." Ex. G at 1.

In addition to the help he provided his brother, Mr. Riccio similarly cared for his mother in the final years of her life, when she was dying of dementia. Ex. F. He also assisted other members of his family by performing repairs and more extensive renovation work of their houses, always without charging them. Ex. A at 1.

Mr. Riccio's charity and generosity also extend to his church. Although he was not raised in a particularly religious household, Mr. Riccio found his faith as a teenager and, as his daughter describes "[d]uring his high school years, while all of his friends were out partying and having a good time, my father instead start[ed] going to church." Ex. E at 1. The church he joined was Trinity Tabernacle of Gravesend, in Brooklyn. Trinity Tabernacle's former pastor Reverend Lucian Gandolfo—who, in his previous career, was an FBI agent assigned to the New York field office—describes Mr. Riccio as "courteous, respectful, thoughtful, and humble." Ex. B at 1. Rev. Gandolfo writes that Mr. Riccio contributed his contracting skills to the church when he rewired the building to support upgrades to its audio-visual system. Besides doing the exemplary work that his clients have come to expect, Mr. Riccio refused any payment from Trinity Tabernacle for his labor and skill. Rev. Gandolfo describes this as "a huge blessing . . . and it spoke loudly as to the thoughtfulness, generosity, and heart of Mr. Riccio. . . . He gave willingly without expectations of any sort." *Id.* at 2.

The attached testimonials from Mr. Riccio's family, friends, and community members make clear that, notwithstanding the instant crime, which may suggest selfishness or venality, he is a generous and selfless person who has devoted his time and energy to improving the lives of others. His lifetime of good work, fellowship, and love and care for his friends and family favor imposition of a below-guidelines sentence of probation.

### III. Mr. Riccio Accepts Responsibility and Already Has Suffered Serious Consequences for His Criminal Conduct.

Mr. Riccio has accepted full responsibility for his actions. He cooperated with the IRS's investigation and provided the business records as requested of him. And he agreed to waive indictment and plead guilty to the crime of willfully failing to pay employment taxes. That he is only facing sentencing now, more than six years after the offense's completion, is only because he needed to have counsel appointed after he ran out of money to pay his initial retained lawyer, and because of delays attributable to the COVID-19 pandemic.

5

Beyond merely cooperating and pleading guilty, however, Mr. Riccio is consumed by feelings of contrition and remorse for his failure to pay the taxes he owed. Family members describe him as regretting his actions and willing to do everything he can to right this wrong. Ex. E ae 3; Ex. F; Ex. G at 1; Ex. I at 3. His therapist writes that he "was devastated, embarrassed and shamed by the knowledge of what he had done, and the hurt he caused those around him by his bad decisions." Ex. K at 2. "It's clear," his cousin Richard Dandrea explains, "that this experience has had such an impact on him that he would never do something like this again and in the future will take great pains to ensure he is complying with tax codes and other law." Ex. A at 1. And former FBI agent and current reverend Lucian Gandolfo continues to "feel comfortable standing for his integrity" because he "has owned his crimes without excuses" and "is on the 'straight and narrow',' with zero intent to defraud or cut corners going forward." Ex. B at 2.

Part of the reason that Mr. Riccio feels so remorseful is that, even without the imposition of a sentence, this offense has taken a major toll on his life. It led to the dissolution of his contracting business, his life's work. Ex. E at 3. And it has stymied his ability to obtain and maintain employment. For example, in August 2020, Mr. Riccio was hired as a building superintendent in Manhattan. The job offered a competitive salary, union protection, and, ultimately, the promise of residency in the building. Ex. L. In November of 2021, however, the building's management became aware of Mr. Riccio's guilty plea in this case, in part through a Google search of his name, which revealed the government's press release after Mr. Riccio pled guilty. Ex. M. Mr. Riccio was suspended pending an investigation, *id.*, and, in December, was terminated from his job, PSR Addendum. Since losing that position, Mr. Riccio has been interviewed for other building superintendent openings, but each time was not offered the position based on his criminal conviction in this case.

The collateral consequences of a felony conviction are well established. *See generally United States v. Nesbeth*, 188 F. Supp. 3d 179, 184-86 (E.D.N.Y. 2016) (setting forth collateral consequences of federal felony conviction). Here, even without a sentence and final judgment conviction, Mr. Riccio has already been stigmatized for his conduct and been impeded from finding and maintaining employment. Much of this can be attributed to the government's press release following Mr. Riccio's plea hearing, which declares in its headline that he admitted to engaging in "payroll tax fraud." Ex. M at 2. That headline is technically inaccurate and exaggerates what Mr. Riccio admitted doing, *i.e.*, not paying the taxes due, as something even more prejudicial, *i.e.*, affirmatively lying about the taxes he owed.[1] The accusation that Mr. Riccio not merely failed to pay his taxes, but lied about it, resulted in his losing the superintended position he obtained in Manhattan. Since then, it has prevented him from finding a new position.

---

[1] Undersigned counsel contacted the U.S. Attorney's Office to request that the headline be corrected to reflect Mr. Riccio's actual charge of conviction. Today, no change has been made to the government's press release, which remains available online. *See* https://www.justice.gov/opa/pr/new-york-business-owner-pleads-guilty-payroll-tax-fraud (last visited Jan. 18, 2022).

Accordingly, even without this Court's imposition of sentence, Mr. Riccio is already being penalized by the detrimental publicity of this case. Additional imprisonment would only unnecessarily cause additional injury and impair his ability to find a new job and repay his debt to the government. We submit that the consequences Mr. Riccio has already suffered have been enough to afford adequate punishment.

### IV. Mr. Riccio's Guidelines Range Is Based on an Estimated Loss Amount That Places Him Just $5,500 Above the Threshold for a Non-Incarceration Guidelines Sentence.

The government and presentence investigation report estimate that Mr. Riccio's tax loss is approximately $255,433. This represents 15.3%, the percentage of combined employer and employee FICA withholding, of $1.6 million, the estimated amount of AD Custom Interior's payroll for the years 2011-15. PSR ¶ 6. The $1.6 million estimate is based upon the $3.1 million in checks that Mr. Riccio cashed at MD Corporate Services over those years, less estimated business expenses he earned over those five years. PSR ¶ 5. As a result of these estimates, Mr. Riccio's total loss amount is greater than $250,000 and places in an adjusted offense level of 15, outside the zone of ranges for which the Sentencing Guidelines recommend a non-incarceration sentence. PSR ¶ 63.

Mr. Riccio's estimated tax loss, however, is just that: an estimate. And it is based on business expenses that Mr. Riccio's former counsel presented to the government based on very limited information. Specifically, predecessor counsel examined the business expenses AD Custom Interiors spent on just four renovation projects in 2016 and, averaging them, reached a rough estimate that 42% of AD Customs' receivable payments, or approximately $1.52 million, was spent on expenses unrelated to labor. That yielded the $255,433 tax loss that the government seeks against him. As noted, this estimate was based on a tiny sample size, and it did not take into account long-term fixed costs, such as maintaining the company's vehicles and purchasing new tools to be used across jobs. And had the percentage of these average, roughly estimated business expenses been just one point higher, at 43%, Mr. Riccio's tax loss would be less than $250,000, resulting in an adjusted guidelines offense level of 13, placing him in the zone where a probationary sentence is permitted.

We acknowledge that the Sentencing Guidelines permit this Court to "make a reasonable estimate base on the available facts," U.S.S.G. § 2T1.1 cmt. n.1, and that the available facts here are sparse due to Mr. Riccio's inadequate bookkeeping. For that reason, we are not objecting to the estimated tax loss amount set forth in the PSR. But we do emphasize that the 18-24 months' imprisonment contemplated by the guidelines rests on accounting that is far from certain and may very well overstate the amount of tax loss that Mr. Riccio actually owes. Given the uncertainty about the amount Mr. Riccio underpaid his taxes, and how close the loss amount is to the $250,000 guidelines threshold, we respectfully urge the Court to give Mr. Riccio the benefit of the doubt and not hold him to the sentencing range the guidelines recommends. Rather, a variance reflecting the lower adjusted offense level of 13, representing a tax loss of less than $250,000, would be appropriate and consistent with the non-incarceration sentence we seek.

**V.    A Sentence of Probation Is Consistent with the Punishment Imposed on Similarly Situated Defendants in This District.**

A non-guidelines probationary sentence in this case would satisfy the ends of sentencing. Specifically, it would be just punishment for Mr. Riccio's offense, in light of his acceptance of responsibility and the collateral consequences he is already suffering. It would be sufficient to deter Mr. Riccio, who has no other criminal history, from committing any additional offenses. And it would best rehabilitate him, by providing him an opportunity to work again and begin repaying the debt he owes the United States.

A probationary sentence would also be consistent with the punishment this and other courts have imposed on similarly situated defendants. For example, this Court sentenced a defendant who willfully failed to pay more than $300,000 in FICA taxes to three years' probation, *see United States v. Chen*, No. 18-cr-120 (NGG), and sentenced another defendant who failed to report over $6 million in business earnings, resulting in more than $2 million in unpaid taxes, to a similar probationary period, *see United States v. Shin*, No. 12-cr-182 (NGG). Other judges in this district have also imposed non-incarceration sentences upon defendants, like Mr. Riccio, who are first time offenders and failed to pay similar or greater tax amounts.

For example, last year, the owner of masonry business who failed to pay over $300,000 in FICA taxes was sentenced by Judge Brodie to three years' probation, *see United States v. Struk*, No. 20-cr-283 (MKB), and a contractor who failed to pay $268,000 in FICA taxes was sentenced by Judge Komittee to 18 months' probation, *see United States v. Zsholobchuk*, No. 20-cr-167 (EK). Likewise, Judge Donnelly sentenced the owner of a dry cleaning business who failed to pay over $700,000 in FICA taxes to two years' probation. *See United States v. Yun*, No. 19-cr-131 (AMD). Judge Dearie sentenced a physician who failed to pay over $300,000 in personal taxes to three years' probation. *See United States v. Testa*, No. 19-cr-85 (RJD). Judge Hurley sentenced a contractor who failed to pay approximately $250,000 in FICA taxes to three years' probation. *See United States v. Taylor*, No. 18-cr-251 (DRH). Judge Azrack sentenced the owner of auto repair shop who failed to pay more than $185,000 in FICA taxes to three years' probation. *See United States v. Chaimowitz*, No. 17-cr-644 (JMA). Judge Block sentenced the owner of a grocery store who failed to pay $232,000 in FICA taxes to five years' probation. *See United States v. Cohen*, No. 16-cr-373 (FB). Judge Ross sentenced a contractor who failed to pay more than $150,000 in taxes to five years' probation. *See United States v. Omotade*, No. 16-cr-230 (ARR). Judge Weinstein sentenced the owner of small limousine business who failed to pay over $380,000 in FICA taxes to three years' probation. *See United States v. Reitzenstein*, No. 15-cr-643 (JBW). Judge Vitaliano sentenced a contractor who failed to pay more than $300,000 in taxes to five years' probation. *See United States v. Cishooga*, No. 14-cr-217 (ENV). Judge Feuerstein sentenced the owner of a construction company who failed to pay over $500,000 in FICA taxes to three years' probation. *See United States v. Minunno*, No. 13-cr-248 (SFJ). And Judge Irizarry sentenced two defendants who evaded paying more than $600,000 in taxes to five years' probation. *See United States v. Taliercio*, No. 13-cr-29 (DLI).

January 19, 2022

As those cases demonstrate, imprisonment is not needed to afford adequate punishment for the crime of willful failure to pay taxes. It certainly is not necessary for Mr. Riccio, a 58-year-old man with no criminal record whose crime occurred six years ago, who has exceptionally strong community ties and a history of generosity and good works, and who has already suffered serious collateral consequences as a result of his conduct. Rather, the appropriate sentence in this case, for this defendant, is a term of probation, as this district's treatment of other similarly situated tax offenders shows.

\*         \*         \*

Anthony Riccio failed to pay FICA taxes for his employees at a difficult and painful moment in his life. This conduct was aberrational and he has accepted responsibility, already suffered consequences, and is prepared to pay the debt he owes to the United States in full. The term of imprisonment that the sentencing guidelines recommend should not be imposed, in light of the significant mitigation he presents, the uncertainty of the actual loss amount he owes, and the way this and other courts in the district have treated similarly situated defendants. A sentence of probation is sufficient, but not greater than necessary, to satisfy the § 3553(a) factors. We respectfully request that the Court impose that non-guidelines punishment when Mr. Riccio comes before Your Honor for sentencing.

Respectfully submitted,

/s/
Benjamin Yaster
Federal Defenders of New York, Inc.
(646) 842-1754
*Counsel for Anthony Riccio*

cc:   Counsel of record (via ECF)
      Jaime Turton, Probation (via email)